JUDGE CEDARBAUM

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

12 CIV 4438

------------------------------------------------------------------X

WAGNER SALAZAR and WALKIRIA SALAZAR,        :        INDEX NO.
                                             :        ECF CASE
                              Plaintiffs,    :
                                             :        JURY TRIAL DEMANDED
            - against -                      :
                                             :
THE CITY OF NEW YORK, a municipal entity,    :
SERGEANT JOSENNY HIDALGO, and                :
POLICE OFFICER CHASE MANERI, POLICE          :        COMPLAINT
OFFICER JAMES TRAPASSO and JOHN DOE          :
POLICE OFFICERS 1-9,                         :
                                             :
                              Defendants.    :

------------------------------------------------------------------X

Plaintiffs WAGNER SALAZAR and WALKIRIA SALAZAR bring this action

for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. §

1983 and 42 U.S.C. § 1988 for violations of their civil rights, as said rights are secured by

said statutes and by the Constitution of the United States. Plaintiffs allege the following

on information and belief.

## I.    PRELIMINARY STATEMENT

1.      On the night of September 17-18, 2011, Plaintiff Wagner Salazar and his

sister Plaintiff Walkiria Salazar were on the sidewalk in the vicinity of their home

peacefully conversing with some friends. Another person (an unknown non-party to this

litigation) had parked their vehicle nearby with its radio on. Three police officers,

including named defendants Police Officer Chase Maneri and Police Officer Josenny

Hidalgo arrived in a police car. The officers wanted the car radio to be turned off. The

officers addressed themselves to Plaintiff Wagner Salazar, although the vehicle was not

his. Addressing him in English, which Mr. Salazar does not understand, the officers questioned him. Mr. Salazar understood only the words for "I.D.," and dutifully provided his I.D. to the officers. About 15 minutes later, Mr. Salazar asked for the return of his ID. The officers became angry at Mr. Salazar. One of the officers quickly opened the door to the police car near which Mr. Salazar was standing, knocking him backwards. The officers tackled Mr. Salazar to the ground. The officers beat Mr. Salazar, inflicting such injuries that he was required to be hospitalized. Mr. Salazar was arrested, and later falsely charged with a violation of the City Administrative Code for the use of sound devices and resisting arrest.

2.      Mr. Salazar's sister, Plaintiff Walkiria Salazar, witnessed the vicious beating of her brother and fainted. After regaining consciousness, Walkiria Salazar went to the 30th Precinct in Manhattan, where Wagner Salazar had been taken by the police. Walkiria Salazar saw her brother being loaded into an ambulance. She asked the ambulance personnel, and then the police officers present, if she could accompany her brother to the hospital. Instead, the officers arrested Walkiria Salazar on false charges of obstructing governmental administration and attempted assault.

3.      Both Wagner and Walkiria Salazar were required to spend many months fighting these false charges, returning to court almost a dozen times between them. All charges were ultimately dismissed. The Plaintiffs now seek fair and just compensation for this egregious and flagrant violation of their civil rights.

## II.    JURISDICTION

4.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States

Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(3) and (4) and the aforementioned statutory and constitutional provisions.

## III.   VENUE

5.      Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the claims arose in this district.

## IV.   JURY DEMAND

6.      Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## V.   THE PARTIES

7.      At all times relevant to this action, Plaintiff Wagner Salazar was and is a resident of the City and State of New York, in the County of New York.

8.      At all times relevant to this action, Plaintiff Walkiria Salazar was and is a resident of the City and State of New York, in the County of New York.

9.      Defendant THE CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

10.      Defendant THE CITY OF NEW YORK maintains the New York City Police Department (the "NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, the City of New York.

3

11.     At all times relevant to this action, the individually named Defendant POLICE OFFICER CHASE MANERI was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

12.     At all times relevant to this action, the individually named Defendant SERGEANT JOSENNY HIDALGO was a duly sworn police officer of said department and was acting under the supervision of said department and according to her official duties.

13.     At all times relevant to this action, the individually named Defendant POLICE OFFICER JAMES TRAPASSO was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

14.     At all times hereinafter mentioned, the Defendant POLICE OFFICERS JOHN DOES 1-9 (together with the foregoing individual defendants, the "Individual Defendants") were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

## VI.    FACTS

15.     Somewhat after midnight on the night of September 17-18, Plaintiffs Wagner and Walkiria Salazar were on the sidewalk in the vicinity of 87 Hamilton Place in Manhattan.

16.     About 10-15 other people were socializing in the same vicinity.

17.     A motor vehicle was parked on the street near where the group were socializing.

4

18.     This vehicle did not belong to Plaintiffs, and Plaintiffs did not have custody or control of the vehicle.

19.     This vehicle had its windows and/or doors open so that its stereo could be heard by those gathered near it.

20.     The music was not loud by neighborhood standards.

21.     A police car arrived at the location with three officers inside.

22.     One of the officers inside the vehicle was NYPD Police Officer Chase Maneri of the 30th Precinct.

23.     One of the officers inside the vehicle was NYPD Sergeant Josenny Hidalgo of the 30th Precinct.

24.     A third officer, POLICE OFFICER JAMES TRAPASSO was also present in the vehicle.

25.     The officers called to Plaintiff Wagner Salazar, in English, asking him to approach their car.

26.     Plaintiff Wagner Salazar, who does not speak English, did not realize or understand that the police were addressing him.   However, others present told him that the officers were calling to him.

27.     Plaintiff Wagner Salazar went to officers' car.

28.     The officers asked Plaintiff Wagner Salazar for his ID, and he provided it.

29.     The officers said other things, in English, which Plaintiff did not understand.

30.     The officers continued to hold Plaintiff Wagner Salazar's ID.

31.     Plaintiff Wagner Salazar remained in the vicinity, talking with his friends.

32.    After approximately 15 minutes, Plaintiff Wagner Salazar approached the police vehicle once more, to ask for the return of his ID.

33.    One of the officers inside the car, Defendant Sergeant Josenny Hidalgo, became angry at Plaintiff Wagner Salazar.

34.    Defendant Sergeant Josenny Hidalgo quickly opened the door to the police vehicle.

35.    The door struck Plaintiff Wagner Salazar, causing him to fall backwards.

36.    Defendant Sergeant Josenny Hidalgo, Defendant Police Officer Chase Maneri, and Defendant Police Officer James Trapasso exited the car, tackled Plaintiff Wagner Salazar, and began beating him.

37.    The officers beat and struck Plaintiff Wagner Salazar for several minutes.

38.    Other officers, Defendant Police Officers John Doe 1-9, arrived in further police vehicles, and took part in the beating and arrest of Plaintiff Wagner Salazar.

39.    Plaintiff Walkiria Salazar fainted due to the shock of seeing her brother be so viciously attacked.

40.    Plaintiff Wagner Salazar was taken to the 30th Precinct.

41.    After regaining consciousness, Plaintiff Walkiria Salazar went to the 30th Precinct to look for her brother.

42.    At the 30th Precinct, an ambulance arrived to take Plaintiff Wagner Salazar to the hospital.

43.    Outside the 30th Precinct, Plaintiff Walkiria Salazar saw the ambulance.

44.    Plaintiff Walkiria Salazar learned that the ambulance was there to take her brother to the hospital.

6

45.     Plaintiff Walkiria Salazar asked the EMS personnel who operated the ambulance if she could accompany her brother to the hospital.

46.     The EMS personnel instructed Plaintiff Walkiria Salazar to ask the police officers present if she could go with her brother.

47.     Plaintiff Walkiria Salazar did so.

48.     Defendant Police Officer Chase Maneri, who was one of the officers who arrested Plaintiff Wagner Salazar, told Plaintiff Walkiria Salazar, in sum and substance, that she could not accompany her brother because she was being arrested.

49.     Defendant Police Officer Chase Maneri then arrested Plaintiff Walkiria Salazar.

50.     The ambulance took Plaintiff Wagner Salazar to the hospital in custody of the police.

51.     Plaintiff Wagner Salazar was held in custody at the hospital overnight, cuffed to a hospital bed.

52.     Plaintiff Wagner Salazar suffered severe injuries to his head, face, and other parts of his body.

53.     Plaintiff Wagner Salazar was arraigned.  The criminal complaint was sworn by Police Officer Chase Maneri.

54.     The criminal complaint falsely stated that Plaintiff Wagner Salazar operated and used or caused to be operated and used a sound reproduction device in such a manner as to create an unreasonable noise.

55.     In truth, however, the vehicle in which the stereo was playing did not belong to Plaintiff Wagner Salazar, and Plaintiff did not operate it.

56.    The criminal complaint falsely stated that Plaintiff Wagner Salazar "ran away" from Police Officer Chase Maneri and "flailed [his] body in an attempt to evade arrest."

57.    In truth, however, Plaintiff Wagner Salazar did no such thing.

58.    The criminal complaint falsely stated that Plaintiff Wagner Salazar swung his "closed fist at Sergeant Josenny Hidalgo in an attempt to strike Sergeant Hidalgo."

59.    In truth, however, Plaintiff Wagner Salazar did no such thing.

60.    Plaintiff Wagner Salazar was charged with a AC24-244(a), a violation of the City Administrative Code for the use of sound devices.

61.    Plaintiff Wagner Salazar was subjected to four other charges.  Each of the remaining charges were based on false allegations that Plaintiff resisted arrest for the noise violation.

62.    Plaintiff Wagner Salazar was charged with resisting arrest, PL 205.30.

63.    Plaintiff Wagner Salazar was charged with harassment in the second degree, PL240.26(1).

64.    Plaintiff Wagner Salazar was charged with attempted assault in the third degree, PL110/120.00(1).

65.    Police Officer Chase Maneri knew that each of these sworn statements of fact were false when Police Officer Chase Maneri swore to the truth of these statements in the criminal complaint against Plaintiff Wagner Salazar.

66.    As a result of Police Officer Chase Maneri's false statements in the criminal complaint, Plaintiff Wagner Salazar was prosecuted for the above-named offenses.

8

67.    In all, Plaintiff Wagner Salazar was held in custody for approximately 36 hours.

68.    Plaintiff Wagner Salazar was compelled to return to the criminal court on multiple occasions to dispute these charges.

69.    All charges against Plaintiff Wagner Salazar were ultimately **dismissed**.

70.    Plaintiff Walkiria Salazar was charged with obstructing governmental administration and attempted assault.

71.    Plaintiff Walkiria Salazar was held in custody in excess of 36 hours.

72.    Plaintiff Walkiria Salazar was threatened with additional baseless felony charges.

73.    Plaintiff Walkiria Salazar was compelled to return to the criminal court on multiple occasions to dispute these charges.

74.    All charges against Walkiria Salazar were ultimately **dismissed**.

## VII.    Facts Supporting the Plaintiff's *Monell* Claim and Claims for Negligent Training and Supervision

### A. THE NYPD COMPELS ITS OFFICERS TO MEET UNLAWFUL ARREST QUOTAS, CAUSING THOUSANDS OF BASELESS AND UNLAWFUL ARRESTS

75.    The NYPD places emphasis on street-level enforcement of minor violations and quality of life offenses--such as public drinking, public urination, playing loud radios and disorderly conduct.[1]

76.    While the just enforcement of such laws would be laudable, the NYPD compels its officers to meet quotas for such enforcement actions.

---

[1]    Defendants' [City of New York et al.] Local Civil Rule 56.1 Statement of Undisputed Facts, 08 CIV. 01034 (SAS) [SDNY], docket number 144, filed 2/24/2011, paragraphs 116-131.

77.     This quota system is enforced by the very top levels of the NYPD through the Department's Compstat system.

78.     In a full-page ad on page 15 of the May 7, 2012 edition of the New York Daily News, The Patrolmen's Benevolent Association made clear that the quota pressure comes from the top.  Referring to these quotas, the ad is headlined: "Don't Blame the Cop, Blame NYPD Management."

79.     The NYPD uses Compstat to track such enforcement actions statistically.

80.     The NYPD holds weekly crime strategy meetings, "Compstat Meetings," at which such reports are discussed.[2]

81.     Compstat Meetings are attended by all commanders of Precincts, Police Service Areas, Transit Districts and other operational unit commanders within a given Patrol Borough, including the commanding officers and /or supervisors of precinct-based and specialized investigative units.[3]

82.     Also in attendance are representatives from the District Attorneys' Offices as well as Transit and Housing Bureau Commanders whose jurisdictions lie within the patrol borough, Crime Strategy Coordinators from other patrol boroughs, and ranking officers from a variety of support and ancillary units (such as the Legal Bureau which do not perform direct enforcement functions.).[4]

83.     The purpose of these Compstat Meetings is for the commanders to direct and modify street-level law enforcement policy based on Compstat statistics.[5]

---

[2]     Id.
[3]     Id.
[4]     Id.
[5]     Id.

84.     At these weekly Compstat Meetings, commanders either ratify that the statistics show that the NYPD's street-level activities are correctly implementing the NYPD's stated policies, or street-level deployments are modified to bring these activities in line with such policies.[6]

85.     In this way, the highest-level command of the NYPD exercises granular control over summonses and arrests for minor violations and quality of life offenses, as well as for stop, question and frisk activity.[7]

86.     What street-level police officers do is a direct result of these command-level policies.

87.     As the New York Daily News reported, NYPD supervisors give explicit instructions to street-level enforcement personnel that quantity, not quality, matters – promulgating a policy that comes from the very top of the NYPD hierarchy.[8]

88.     Individual officers have stepped forward to denounce the NYPD's use of quotas, which are illegal.[9]

89.     Officers that refuse to meet illegal quotas are subject to adverse employment actions and other retribution from their superiors.[10]

90.     The NYPD officially denies that it maintains and enforces quotas.

---

[6]     Id.

[7]     Id.

[8]     Parascandola, Rocco, "Cops On Tape Pushing Arrest Quotas: NYPD Lt. Janice Williams captured on tape pushing for more busts, but brass says there's no quotas," The New York Daily News, March 3, 2011.

[9]     Parascandola, Rocco, "Cops On Tape Pushing Arrest Quotas: NYPD Lt. Janice Williams captured on tape pushing for more busts, but brass says there's no quotas," The New York Daily News, March 3, 2011; Parascandola , Rocco, "An ex-Bronx cop Ex-Cop Sues City, Says Quotas Led to Firing: Ex-Bronx cop Vanessa Hicks suing city, says quotas led to axing,"
The New York Daily News, May 2, 2011; Parascandola, Rocco, "79th Precinct cops claim retribution: Nine officers say poor evaluations are payback from commander," The New York Daily News, April 10, 2012.

[10]     See id.

91.    However, the existence of this unconstitutional arrest quota custom and/or policy may further be inferred from the posting of lists of quantitative targets for various forms of summonses at the 77th Precinct in Brooklyn.[11]

92.    The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the tape recordings acquired by WABC-TV/DT, in which a 41st precinct sergeant explains that each of his officers is held to a twenty summons per month, and one arrest per month, enforcement quota.[12]

93.    The existence of the aforesaid unconstitutional arrest quota custom and policy may further be inferred from the tape recordings acquired by the Village Voice, including, among other admissions, an 81st precinct sergeant telling his officers to make quota-driven arrests as directed by their superiors even if they must void the arrests at the end of their shifts.[13]

94.    Over a 17-month period ending in October 2009, police officer Adrian Schoolcraft secretly recorded conversations at Bedford-Stuyvesant's 81st Precinct, including 117 roll calls, providing a unique window into the policy and practice of "quality of life" enforcement activities within a typical precinct with a high percentage of minorities in its resident population.

[11]    Fanelli, James, "Cops At Brooklyn's Crime-Ridden 77th Precinct Told To Meet Quotas For Moving Violations, Memos Say," New York Daily News, November 8, 2010. Article incorporated by reference herein and available online at http://articles.nydailynews.com/2010-11-08/local/27080554_1_memos-quotas-seat-belt.
[12]    Hoffer, Jim, "NYPD Officer Claims Pressure To Make Arrests," WABC News, March 3, 2010. Article incorporated by reference herein and available online at http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356.
[13]    Rayson, Graham, "The NYPD Tapes, Part 2: Bed-Stuy Street Cops Ordered: Turn This Place Into A Ghost Town." Village Voice, May 11, 2010. Article incorporated by reference herein and available online at http://www.villagevoice.com/2010-05-11/news/nypd-tapes-part-2-bed-stuy/.

95.    The recordings showed superior officers like precinct commander Steven

Mauriello instructing cops to arrest people for things like "blocking the sidewalk," even if

there was no basis for such a charge.  The Village Voice reported:[14]

> Supervisors told officers to make an arrest and "articulate" a charge later, or
> haul someone in with the intent of voiding the arrest at the end of a shift, or
> detain people for hours on minor charges like disorderly conduct—all for the
> purpose of getting citizens off the street. People were arrested for not showing
> identification, even if they were just a few feet from their homes. Mental health
> worker Rhonda Scott suffered two broken wrists during a 2008 arrest for not
> having her ID card while standing on her own stoop.

***

> A lieutenant follows up, telling the cops to be more aggressive. "If they don't
> move, they are going to get out of control and think that they own the block.
> They don't own the block. We own the block. They might live there, but we
> own the block. We own the streets here."

***

> A similar order was given by a sergeant on November 23, 2008: "If they're on
> a corner, make 'em move. If they don't want to move, lock 'em up. Done deal.
> You can always articulate [a charge] later."

***

> [One supervisor told his officers:] " I want a ghost town. I want to hear the
> echo from one end of the street to the other. . . . That's your mission."

96.    A department-wide policy can also be inferred from the fact that for

decades, NYPD officers have continued to enforce an anti-loitering statute that was long

ago declared unconstitutional.[15]

## B. THE NYPD TOLERATES AND CONDONES WIDESPREAD PERJURY BY ITS OFFICERS

97.    NYPD policy rewards arrests that are based on false statements in criminal

complaints sworn by NYPD officers.

---

[14]    Rayman, Graham, "The NYPD Tapes, Part 2. Bed-Stuy street cops ordered: Turn this place into a ghost town," The Village Voice, May 11, 2010.

[15]    Glaberson, William, "Long Fight Ends Over Arrests for Loitering," February 7, 2012.

98.     As United States District Court Judge Jack Weinstein wrote: "Informal inquiry by [myself] and among the judges of this court, as well as knowledge of cases in other federal and state courts ... has revealed anecdotal evidence of repeated, widespread falsification by arresting officers of the New York City Police Department."[16]

99.     By its nature, the true extent of police perjury has not been documented. The Mollen Commission in the 1990's found that police perjury was so pervasive that the police even had a word for it: "testilying."[17]

100.    Police perjury often involves lying about matters that are outcome determinative in ... litigation, and that go to the heart of a defendant's guilt or innocence.[18]

101.    Certain types of arrests occur with such frequency that the pattern and practice of police perjury has been at least partially exposed.

102.    In 2008, the New York Times documented at least 20 cases in federal court in which police provided false boilerplate testimony to justify searches and seizures of guns.  These cases represented only that small fraction of cases in which the boilerplate testimony could be challenged with more than the word of the defendant.[19]

103.    Another category of arrest where police perjury has been documented is misdemeanor marijuana arrests.  Where an officer encounters a person in possession of a small amount of marijuana, the officer can convert the arrest offense from a violation to a misdemeanor simply by testilying that the marijuana was in "plain view."

---

[16]     Marzulli, John, "Judge Jack Weinstein rips NYPD on false arrests as brothers sue for $10M over wrongful narcs bust," The New York Daily News, Nov. 30, 2009.
[17]     Cunningham, Larry, "Taking on Testilying: The Prosecutor's Response to In-Court Police Deception," *Criminal Justice Ethics* Winter/Spring 2009.
[18]     Id,
[19]     Weiser, Benjamin, "Police in Gun Searches Face Disbelief in Court," May 12, 2008.

104.     Each year the NYPD makes thousands of arrests for the possession of marijuana "in plain view." The overwhelming publicly available evidence shows that in the majority of these arrests, the marijuana was not in plain view when the person was arrested, and the basis of the charge was police perjury.[20]

105.     The NYPD has taken no steps to disincentivize – much less punish – the practice of perjury that underlies these arrests. Indeed, the number of such arrests continues to increase.[21]

106.     Nor has the NYPD taken any steps to punish police perjury in other contexts.

107.     There is a nexus between arrest quotas and the NYPD's toleration of police perjury: **police under pressure to make their quota of arrests make false arrests based on perjured accusations in order to do so**.[22]

### C. THE NYPD UNLAWFULLY DISCRIMINATES AGAINST LATINOS AND AFRICAN AMERICANS IN MAKING ARRESTS

108.     NYPD "quality-of-life" enforcement unlawfully limits the use of the public streets by minorities (economic, racial, or sexual) disfavored by the NYPD.

109.     The NYPD's enforcement policies are highly discriminatory against minorities, especially young black and Latino males.

110.     Once again, the best-documented example of this institutionalized racism is found in the thousands of misdemeanor marijuana arrests that take place each year.

---

[20]     Levine, Harry G. and Deborah Peterson Small, Marijuana Arrest Crusade: Racial Bias and Police Policy in New York City 1997-2007, New York Civil Liberties Union, April 2008, p. 5.
[21]     Parascandola, Rocco and Sarah Armaghan, "Arrests for low-level pot possession higher in 2011 than 2010, despite NYPD directive restricting busts Marijuana arrests near an all-time high," The New York Daily News, February 2, 2012; Beekman, Daniel, Study claims NYPD made hundreds of unlawful pot arrests," The New York Daily News, April 03, 2012.
[22]     Marzulli, John, "We fabricated drug charges against innocent people to meet arrest quotas, former detective testifies," The New York Daily News,  October 13th 2011.

111.    For many years, New York City has arrested African Americans at seven times the rate of whites, and Latinos at nearly four times the rate of whites.[23]

112.    The hundreds of thousands of stop-and-frisk encounters each year are another example of an enforcement policy that unlawfully targets minorities.

113.    A Columbia University study summarized its findings:

> The racial skew and limited efficiency of both the "stop, question, and frisk" tactics and marijuana enforcement in detecting serious crimes suggest that **non-white New Yorkers bear a racial tax from contemporary policing strategy**. The social costs of race-based implementation of these twin tactics and their questionable constitutionality are not offset by any substantial and observed benefits to public safety.[24]

D.  THE NYPD HAS A POLICY AND PRACTICE OF TOLERATING AND CONDONING POLICE MISCONDUCT

114.    When the Civilian Complaint Review Board substantiates claims of police misconduct, The NYPD usually does **not** follow the board's recommendations that officers guilty of misconduct be given the most serious penalty. From 2002 to 2010, he said, the board recommended that 2,078 officers receive the most severe penalty. That suggested discipline was given to only 151 officers.[25] Thus, the Department has set a policy that the consequences of misconduct will be mild or nonexistent.

115.    This pattern of toleration of violent police misconduct by the NYPD is a policy and practice of long standing: in 2007, the New York Civil Liberties Union found that the NYPD's practice if "condoning" police misconduct actually got worse over the period of time studied (1994-2006).  The NYCLU researchers found:

---

[23]    Memo (In Lieu of Testimony) of Harry G. Levine, Department of Sociology, Queens College and The Graduate Center, City University of New York
Regarding New York State Senate Bill 5187 (GRISANTI), June 15, 2011.
[24]    Amanda Geller and Jeffrey Fagan, "Pot as Pretext:  Marijuana, Race, and the New Disorder in New York City Street Policing," Schools of Social Work and Law, Columbia University, February 2010.
[25]    Baker, Al, "Independent Agency Gets New Powers to Prosecute New York Police Officers," March 27, 2012.

> Of the more egregious cases of misconduct that have been substantiated by the
> CCRB and referred to the NYPD for disciplinary action between 2000 and
> 2004 – the last year for which complete data [were then] available on
> disciplinary action – the police commissioner has rejected the CCRB's
> findings in 63 percent of those cases. When discipline was imposed, it was
> strikingly lenient in light of the severity of the misconduct that has been
> documented by the CCRB.[26]

116.    Similar indifference to substantiated allegations of police misconduct was

documented in a 1998 report by the Human Rights Watch.[27]

E.  THE NYPD UNLAWFULLY CHARGES INNOCENT PEOPLE WITH
    'COVER' CHARGES TO PUNISH "CONTEMPT OF COP"

117.    Upon information and belief, police officers in the City of New York

make arrests in the absence of the commission of any crime by the person arrested,

motivated by a desire to punish the arrestee for the arrestee's perceived failure to display

the degree of deference or subservience demanded by the arresting officers.

118.    Such arrests are frequently referred to as "**contempt of cop**" arrests.

119.    In order to conceal the illegality of these arrests, the victim of the unlawful

arrest is charged with a "**cover charge**," usually a low-level crime which does not require

a complainant, and whose elements can be established, for the purposes of a criminal

complaint, by the officer's own perjured affidavit or testimony.

120.    NYPD police officers have a pattern and practice of charging one or more

of a trinity of offenses as their favored cover charges: disorderly conduct, resisting arrest,

and obstruction of governmental administration.

---

[26]     Mission Failure: Civilian Review of Policing in New York City (1994-2006), The New York
Civil Liberties Union, September 2007.
[27] "Shielded from Justice: Police Brutality and Accountability in the United States," Human Rights
Watch, June 1998.  Report incorporated by reference herein and available online at
http://www.columbia.edu/itc/journalism/cases/katrina/Human%20Rights%20Watch/uspohtml/t
oc.htm.

121.    However, other charges that require no complainant, such as quality of life infractions like open container or excessive noise violations, are also used to cover false arrests.

122.    The New York Times published a special report on the incidence of police brutality as a response to perceived "contempt of cop" by residents of the City of New York, and documented officers' use of cover charges in such cases.[28]

123.    The NYPD has never undertaken any internal study of contempt of cop arrests or cover charges, and statistics on these practices are not available. However, there is extensive evidence of a widespread practice of false cover charges.

124.    In a case profiled by the CCRB, that board substantiated a quintessential contempt-of-cop/cover charge false arrest: "The board also determined that the second officer improperly drew his gun, failed to provide his name as required by the department's Patrol Guide, and lacked probable cause to issue the disorderly conduct summons, a summons motivated by the man's challenging the officers' actions."[29]

125.    In another such case, the CCRB found that a detective struck a man in the back of the head with a gun when the man questioned the detective. The man was charged with disorderly conduct, which charges were dismissed.[30]

126.    In another such case, the CCRB found that without legal justification an officer arrested a man who accidentally bumped into him on the street. The CCRB found that the officer issued the man a summons charging him with disorderly conduct, and the

---

[28]    Sontag, Deborah, and Barry, Dan, "CHALLENGE TO AUTHORITY: A special report: Disrespect as Catalyst for Brutality," New York Times, November 19, 1997. Article incorporated by reference herein and available online at http://www.nytimes.com/1997/11/19/nyregion/challenge-to-authority-a-special-report-disrespect-as-catalyst-for-brutality.html?pagewanted=all.
[29]    CCRB Case Profiles, available at http://www.nyc.gov/html/ccrb/html/profiles.html (last visited May 15, 2012).
[30]    Id.

officer told him, "You're lucky I didn't beat the shit out of you." A court dismissed the disorderly conduct summons.[31]

127.    In July 2008, police stopped and arrested a man in the Lower East Side area of Manhattan. As reported in the New York Post of July 30, 2008, after two officers placed the arrestee on the ground, one of the officers began beating him with his nightstick. Two bystanders captured the beating on video. The two men who filmed the beating were arrested and charged with disorderly conduct.[32]

128.    As reported in the New York Daily News on June 16, 2010, Queens councilman Dan Halloran was given a ticket for blocking a crosswalk when he stopped to take pictures of a New York City Police Department vehicle that Mr. Halloran had observed driving recklessly and violating traffic laws on its way to a Dunkin' Donuts.[33]

129.    As reported by NBC New York television news on July 22, 2010, two officers who were videotaped beating a defenseless arrestee, Walter Harvin, arrested Mr. Harvin and charged him with resisting arrest and disorderly conduct in order to justify their attack upon him. One of the officers involved was criminally charged as a result.[34]

130.    As reported by Brooklyn City Councilman in July 2007, two bystanders observing a young man who was handcuffed and immobilized being beaten by police officers, were themselves beaten and arrested when they asked the officers to stop beating

---

[31]    Id.
[32]    Alpert, Lukas I., and Weiss, Murray, "2nd Video Gives NYPD Black Eye." New York Post, July 29, 2008. Article incorporated by reference herein and available online at http://www.nypost.com/p/news/regional/item_EZ7SbCpNNtsxar3MnXJ5JM.
[33]    Trapasso, Clare, "Queens councilman Dan Halloran irate over light-running, yakking traffic cop Daniel Chu," New York Daily News, June 16, 2010. Article incorporated by reference herein and available online at http://articles.nydailynews.com/2010-06-16/local/27067286_1_traffic-cop-councilman-ticket.
[34]    Scharr, Jillian, "Video Released in Police Brutality Case," NBC New York, June 22, 2010. incorporated by reference herein and available online at a http://www.nbcnewyork.com/news/local/Video-Released-in-Police-Brutality-Case-96882129.html.

the defenseless arrestee. One of the bystanders was charged with obstruction of justice, resisting arrest and disorderly conduct.[35]

131.    Defendant City of New York and the New York Police Department continue to resist calls for disclosure statistics concerning minor crimes such as the typical "cover charge" crimes.[36]

132.    The NYPD's failure to respond to this well documented problem, and its obstruction of efforts of outside parties to document and address this issue, amount to ratification of the pattern and practice of contempt of cop arrests and excessive force, justified by false cover charges, by the NYPD's agents, employees, and officers.

### F.    THE 30TH PRECINCT HAS AN ESTABLISHED RECORD OF POOR TRAINING AND UNLAWFUL ENFORCEMENT ACTIVITY

133.    A police officer and a sergeant, Michael Carsey and Sgt. William Eiseman, from the 30th Precinct were recently convicted of committing perjury to justify search warrants and arrests.[37]

134.    Until recently, the 30th Precinct's Facebook page sold T-shirts that celebrated the precinct's confrontational attitude with the area's residents. One T-shirt said "Top Ten Statements Made By Perps," a list that included "I want all ya'll badge numbers," "I know my rights," and "I'm gonna sue ya'll." Another shirt for sale read: "30th Precinct: House of Pain."[38]

---

[35]    Shabazz, Saeed "Activist lawyers beaten by Brooklyn police," FinalCall.com News, July 12, 2007. Article incorporated by reference herein and available online at http://www.finalcall.com/artman/publish/article_3711.shtml.
[36] Rivera, Ray and Baker, Al, "Data Elusive on Low-Level Crime in New York City," The New York Times, Nov. 1, 2010. Article incorporated by reference herein and available online at http://www.nytimes.com/2010/11/02/nyregion/02secrecy.html?pagewanted=all.
[37]    Zimmer, Amy, "Police Officer Convicted of Lying to Gain Search Warrant," DNAinfo, March 8, 2012.
[38]    Jacobs, Shayna, "Ex-Police Officer and His Wife Cleared of Charges Stemming From Alleged Precinct Scuffle," DNAinfo, April 26, 2011.

135.    Officers of the precinct have also been the subject of several other lawsuits alleging false arrest and other violations of Constitutional and civil rights.

136.    Defendant Police Officer Chase Maneri is himself the subject of at least one other lawsuit, which contains allegations of false arrest and the giving of false testimony. [Jones v. The City Of New York City et al., 11-cv-03739-BSJ (SDNY)]

## VIII. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of Civil Rights Under 42 U.S.C. 1983
### Against All Defendants

137.    The Defendant THE CITY OF NEW YORK and its agents, servants and employees, including but not limited to Defendant Sergeant Josenny Hidalgo, Defendant Police Officer Chase Maneri, Defendant Police Officer James Trapasso and Defendant Police Officers John Doe 1-9 (collectively, the "Individual Defendants"), deprived Plaintiffs of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

138.    In so doing, the Defendants acted under color of state law, and in accordance with the customs, practices, procedures or rules of the Defendant THE CITY OF NEW YORK.

139.    The Individual Defendants acted in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto, pursuant to the customs, practices, procedures, and the rules of Defendant THE CITY OF NEW YORK and the

New York City Police Department, all under the supervision of ranking officers of said department.

140.    Defendant THE CITY OF NEW YORK and the New York City Police Department are responsible for the actions of their employees under the doctrine of *Monell v. City of New York Department of Social Services*, 436 U.S. 658 (1978), and/or the doctrine of respondeat superior.

141.    Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, and damage to their reputation and standing within their community.

142.    As a result of Defendants' impermissible conduct, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

### SECOND CAUSE OF ACTION
### False Arrest and Imprisonment
### Against All Defendants

143.    Plaintiffs were arrested extrajudicially, without a warrant, and without probable cause.

144.    Plaintiffs were held in custody against their will and without justification.

145.    As a result, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, and damage to their reputation and standing within their community.

146.    Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

### THIRD CAUSE OF ACTION
### Malicious Prosecution
### Against
### Defendant Police Officer Chase Maneri, Police Officer James Trapasso, and
### Sergeant Josenny Hidalgo

147.     Defendants Police Officer Chase Maneri, Police Officer James Trapasso, and Sergeant Josenny Hidalgo commenced, or caused to be commenced, a criminal action against Plaintiff Wagner Salazar by means of a sworn criminal complaint and affidavit.

148.     Defendants Police Officer Chase Maneri, Police Officer James Trapasso, and Sergeant Josenny Hidalgo lacked probable cause to commence the proceeding.

149.     With actual malice, Defendants Police Officer Chase Maneri, Police Officer James Trapasso, and Sergeant Josenny Hidalgo stated facts in the criminal complaint and affidavit which they knew to be false, or caused such statements to be made.

150.     The proceeding terminated in favor of the Plaintiff.

151.     As a result, Plaintiff was caused to suffer violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, and damage to her reputation and standing within his community.

152.     Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## FOURTH CAUSE OF ACTION
### Malicious Prosecution
**Against Defendants Police Officer Chase Maneri, Police Officer James Trapasso and Sergeant Josenny Hidalgo**

153.     Defendants Police Officer Chase Maneri, Police Officer James Trapasso, and Sergeant Josenny Hidalgo commenced, or caused to be commenced, a criminal action against Plaintiff Walkiria Salazar by means of a sworn criminal complaint and affidavit.

154.    Defendants Police Officer Chase Maneri, Police Officer James Trapasso, and Sergeant Josenny Hidalgo lacked probable cause to commence the proceeding.

155.    With actual malice, Defendants Police Officer Chase Maneri, Police Officer James Trapasso, and Sergeant Josenny Hidalgo stated facts in the criminal complaint and affidavit which they knew to be false, or caused such statements to be made.

156.    The proceeding terminated in favor of the Plaintiff.

157.    As a result, Plaintiff was caused to suffer violation of her civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, and damage to her reputation and standing within her community.

158.    Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## FIFTH CAUSE OF ACTION

### Excessive Force
### Against the Individual Defendants

159.    The Individual Defendants used force against Plaintiffs that was greater than that which was objectively reasonable under the circumstances.

160.    As a result, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, and damage to their reputation and standing within their community.

161.    Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial

## SIXTH CAUSE OF ACTION
### Monell Claim
### Against Defendant THE CITY OF NEW YORK

162.    Defendant THE CITY OF NEW YORK established unlawful municipal

policies of:

i.  The enforcement of mandatory arrest quotas on the officers of the NYPD.

ii. Unlawful application of so-called "quality of life" laws.

iii. Tolerating and condoning perjury by police officers.

iv. Tolerating and condoning misconduct by police officers, including the use

of excessive force.

v.  Racial bias against Latinos and African Americans in the making of arrests.

vi. Failure to train and supervise police officers.

163.    As a direct result of these policies, Plaintiffs' constitutional rights were

violated:

i.  Plaintiffs were falsely arrested under the pretext of quality of life

enforcement.

ii. Plaintiffs were the victim of police perjury in the sworn criminal complaint

against him.

iii. Plaintiffs angered a police officer and were subjected to a baseless cover

charges.

iv. Plaintiffs were the victim of excessive force and other forms of police

misconduct.

v.  Plaintiffs are Latino.

164.    As a result, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, and damage to their reputation and standing within their community.

165.    Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**Failure to Train**
**Against Defendant THE CITY OF NEW YORK**

166.    Defendant THE CITY OF NEW YORK failed to adequately train the Individual Defendants and other officers who came into contact with Plaintiffs.

167.    In exercising their discretion, officers of the NYPD so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers.

168.    Among the consistent failures to exercise proper discretion on the part of officers of the NYPD are:

i. NYPD officers frequently commit perjury to justify arrests.

ii. NYPD officers frequently arrest people on baseless "cover" charges in retaliation for perceived disrespect.

iii.NYPD officers make unlawful arrests in order to meet numerical quotas.

iv.NYPD officers frequently make use of excessive force.

169.    These failures to exercise proper discretion would be remedied by proper training of NYPD officers.

170.    As a result of the Defendant's failure to properly train its officers, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional

distress, anguish, anxiety, fear, humiliation, loss of freedom, and damage to their

reputation and standing within his community.

    171.    Plaintiffs demand judgment against Defendants in a sum of money to be

determined at trial.

## EIGHTH CAUSE OF ACTION
### Failure to Intervene
### Against the Individual Defendants

    172.    The Individual Defendants, to the extent that they did not directly

participate in the unlawful conduct of other Defendant Police Officers, were present

when such unlawful conduct occurred.

    173.    These individual Defendant Police Officers had a duty and a realistic

opportunity to intervene to prevent the unlawful conduct of the other Defendant Police

Officers, but failed to do so.

    174.    In failing to intervene, these individual Defendant Police Officers were

deliberately indifferent to a substantial risk of harm to Plaintiff.

    175.    As a result, Plaintiffs were caused to suffer personal injuries, violation of

their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom,

and damage to their reputation and standing within their community.

    176.    Plaintiffs demand judgment against Defendants in a sum of money to be

determined at trial.

    WHEREFORE and in light of the foregoing, it is respectfully requested that the
Court assume jurisdiction and:
    [a] Invoke pendent party and pendent claim jurisdiction.
    [b] Award appropriate compensatory and punitive damages.
    [c] Empanel a jury.
    [d] Award attorney's fees and costs.
    [e] Award such other and further relief as the Court deems to be proper
    and in the interests of justice.

DATED:    New York, New York
June 6, 2012

Respectfully submitted,

DAVID A. THOMPSON, ESQ.
Stecklow Cohen & Thompson
10 SPRING STREET – SUITE 1
New York, New York 10012
Phone: [212] 566-8000
Fax: [212] 202-4952
ATTORNEY FOR PLAINTIFF